No. 69.—JOHN D. STELL, Guardian, &c., plaintiff in error, *vs.* ELIJAH GLASS, in right of his wife, &c., defendant in error.

Where one only of three defendants enters an appeal under the act of 1839, and one of the other two dies, between the first and second trial, he was a party to the appeal, so far as to require his legal representative to be made a party to the cause before it can proceed.

Parol evidence is inadmissible to vary or add to a record. It may be introduced to rebut the charge that the order of the Court of Ordinary was fraudulently procured.

In a bill filed by a ward to recover the trust fund out of the hands of a former guardian, he will be allowed to prove the payment of debts contracted on account of his ward *before*, but not discharged until after, his dismission ; and that, too, without first having the vouchers for these disbursements, allowed by the Court of Ordinary.

The Court of Ordinary having jurisdiction over the question, as to whether a guardian shall vest a portion of his ward's funds in the purchase of land, to be cultivated by the slaves of the minor, their order authorizing it to be done, will be presumed to have been granted upon sufficient evidence as to the expediency of the transaction, and cannot be invalidated in any other court, unless impeached for fraud.

It is error in the court, and a new trial will be granted for mis-direction, if the style of the charge is such as to mislead the jury in mistaking it for direction in point of law, instead of the mere expression of the opinion of the court upon the facts.

For the facts of the case, and the grounds of error, see the opinion of the Supreme Court. His Honor Judge WARNER, having been of counsel in the court below in this cause, gave no opinion upon it in the Supreme Court.

O. WARNER, for the plaintiff in error.

1st. The first error assigned is, that the court below decided that the legal representative of Samuel Thompson, deceased, need not to be made a party to the cause on the appeal, he in his lifetime having failed to appeal, and having died after the appeal was entered.

Previous to the act of 1839, all the defendants or plaintiffs in a cause were required to enter an appeal. By that act, any one of two or more plaintiffs or defendants are allowed to appeal, where the others refuse or fail to do so.—*Hotch. Dig.* 601.

The same statute also provides, " that the whole record shall be taken up ; but in case damages shall be awarded on such appeal, such damages shall only be recovered against the party appealing and his securities."

Before the act of 1839, it is believed that it would have been necessary to have made the representative of Thompson a party. The whole record, by the act of 1839, is required to be taken up. That record must be the entire record. A party in the cause is an important part of the record ; consequently that party must go

up, otherwise the record would be imperfect. Samuel Thompson appears as a party defendant in the cause on the appeal. His answer to the charges in the bill being a part of the record, is before the court on the appeal. The rights and interests of S. Thompson may be affected by the final decree.

It is a rule in equity causes, that all persons interested in the subject matter of the suit should be made parties. In many cases, it would be impossible for the court, in an equity cause on the appeal, to make a suitable decree unless all the parties were really and substantially before it. Suppose two joint plaintiffs in an action at law are sought, by bill in chancery, to be perpetually enjoined. Upon the first trial, a decree of perpetual injunction is had. One of the defendants in the bill appeals from that decree, the other defendant refuses to do so. Upon the appeal, the court, upon the merits of the cause, refuses the perpetual injunction, as to the party appellant. In such a case, what would become of the joint action at law. By the first decree, one joint plaintiff is perpetually enjoined from prosecuting his action. By the decree on the appeal, the other joint plaintiff is permitted to proceed. But the action at law being in its nature joint, how could it be prosecuted ?

Many other cases might be put of similar character, going to show that it would be impossible to make a decree on the appeal, without all the parties being before the court.

What is the proper construction of the act of 1839 ? Before the passage of that act, it was in the power of one of several plaintiffs or defendants to prevent an appeal, by his failing or refusing to join in entering it. That act was passed to remedy this mischief—one defendant or plaintiff has no longer that power.

We have seen that the same act provides that the whole record, that is, the whole cause, including the parties, shall go up. Now, we say, that a sound and proper construction of the act of 1839 does not take away the right of the court to make a decree or pronounce a judgment on the appeal, which will affect the rights of the party not appealing, so far as those rights and interests are involved in the record before the court; that the party not appealing is as much bound by a final judgment on the appeal, and that such judgment can be as fully enforced against him, and to the same extent, as against the party who does appeal, with the exception of damages awarded for frivolous appeal. There is nothing in the act which prohibits the court from pronouncing such a judgment as was made in cases on the appeal before the act. Judgment goes against all the parties on the appeal, except as to damages, where it is necessary, from the proofs in the cause, such a judgment or decree should be given. Any other construction will put it in the power of a party to defeat not only the ends of justice, but effectually stop the regular course of legal proceedings.

2d. The second ground of error assigned is, that the court below rejected parol testimony, offered by counsel for plaintiff in error, relative to the order of the Court of Ordinary of Fayette county, passed at its March term, 1840, authorizing Stell, the guardian, to purchase a tract of land for the benefit of his ward.

The objection urged against the admissibility of this evidence is, that it contradicts the record. But we say, such is not the object or effect of the testimony It will be perceived that the order does not specify what tract of land the guardian should purchase of Thompson, the extent of the tract, or quantity of estate therein. Hence parol evidence was not only admissible to identify the tract of land, bought by the guardian, as being the one referred to in the order, but necessary for that purpose, and to give effect to the subject matter of the order.

Extrinsic parol evidence is admissible generally to give effect to a written instrument, by applying it to its proper subject matter.—3 *Stark on Ev.* 1021 and 1026 ; *Doe ex dem. Freeland* vs. *Bunt*, 1 *Term Rep.* 701 ; *Barkley* vs. *Barkley*, 3 *McCord Rep.* 269. Parol evidence is inadmissible to prove that money, granted by a parish, was for a different purpose than that expressed in the record.—*Bangs* vs. *Snow*, 1 *Mass.* 181.

3d. As to the third ground of error. The defendants in error filed their bill against Stell, the former guardian, to account and to pay over what he was indebted

to them. The question at issue in the pleadings was, what amount was the guardian indebted to his ward ?

The court of equity has peculiar, though not exclusive, jurisdiction in matters of account.

The fact that Stell had been dismissed, upon his application, from the guardianship, is not material. The dismission is not conclusive, that he has been paid, nor, as to the mutual indebtedness between the guardian and ward; if so, the ward is as much concluded as the guardian. The Court of Equity has full and complete jurisdiction of a trust of this character. The court had full power to judge of the correctness and propriety of these accounts of the guardian. The persons to whom the accounts were paid, were competent witnesses to prove the payment. It was contrary to the first principles of equity, to withhold from the guardian credit for money, which was his duty to advance for the necessary education and maintenance of his ward.

A trustee acting in good faith, is entitled to a prompt indemnity for his necessary disbursements and expenses, and has a lien on the trust property for them.— *Murray* vs. *De Rotterdam*, 6 *John. Ch. R.* 52.

4th. The fourth ground of error assigned is, the refusal of the court below to charge the jury, at the request of counsel for plaintiff in error, that the Court of Ordinary of Fayette, had the jurisdiction and the right to pay the order made at its March term, 1840, authorizing Stell, the guardian, to purchase a tract of land of Samuel Thompson, for the benefit of his ward; and that the guardian had the right to make the purchase under it which he did make, unless the same was procured by fraud on the part of the guardian. But the court instead thereof, charged the jury that the state of things, contemplated by the statute under which the order was passed, did not exist, and that the guardian had not the right to apply for, nor the court to grant the order, and that the purchase under it, by the guardian, was a legal fraud, and the sale must be set aside, and the guardian required to account for the money invested in said purchase, with interest.

The first question that presents itself upon this ground of error is, had the Court of Ordinary jurisdiction, and the right, under the circumstances, to pass the order made at the March term, 1840 ?

It is conceded that the Court of Ordinary, in this respect, is a court of limited jurisdiction, and derives its power by statute. The power to grant the order, is derived from the act of the 19th Dec. 1829.

This statute authorizes the guardian, under an order of the Court of Ordinary, when the ward is not possessed of lands, to apply such portion of the disposable funds of the ward, to the purchase of such reasonable portion of land as may be necessary for the purposes of the act, (that is, for agricultural purposes,) when it is manifestly expedient to do so.—*Hotch. Dig.* 335.

The guardian cannot take this step without an order for that purpose. The right to grant the order is conferred by the statute on the court. The court has, unquestionably, jurisdiction of the subject matter of the order, *i. e.* to authorize the guardian to purchase land for his ward. It is true, the statute states the circumstances under which it may be done, but who is to determine whether such circumstances exist ? What tribunal is required to act upon and decide as to their existence ? Most clearly, the Court of Ordinary. That court is called upon to determine, when an application is made for its order, whether there is, in the particular case upon which the application is predicated, such facts and circumstances as will authorize the granting of the order. The court having exclusive original jurisdiction of the subject, is called upon to exercise a sound judicial discretion, in determining whether the application shall be granted or not.

The jurisdiction of a court can never depend upon a proper or improper exercise of discretionary power. What may be manifestly expedient for the interest of the ward, under a given set of circumstances, is matter of opinion.

What one would deem expedient, another might consider inexpedient. The jurisdiction of a court can never depend upon what may be the basis of a thousand conflicting opinions. It must be necessarily presumed, that when the court

passed its order, it had sufficient evidence before it, to authorize the granting of such order. By the act of 21st Dec. 1827, the Courts of Ordinary are authorized to grant an order to sell the real estate of orphans, "where it is made fully and plainly to appear that the same will be for the benefit of such orphans."— *Hotch. Dig.* 482.

Suppose the court grants an order to sell under this last statute, and the guard- ian sell thel and, and the purchaser takes possession; upon the ward's arriving at age, would any court hold, that he could recover the land sold, upon the ground the sale was illegal, for want of jurisdiction by the court that granted the order, because it might he made to appear by competent evidence, that it was plainly and fully against the interest of the ward that the land should be sold ? We say, then, that the Court of Ordinary had jurisdiction, and the right to pass the order of March term, 1840.

The next question is, had the court below the right to impeach, or set aside the order, and consequently, to set aside the purchase of the guardian under it ?

We contend that the order was the judgment of a court of competent jurisdic- tion, and was conclusive, until reversed for error by a tribunal having the power to reverse it; and that the purchase under the order was valid, unless the same were procured by fraud on the part of the guardian.

One court will not look into the proceedings of another, having jurisdiction, in order to ascertain in what manner they acted.—*Hall* vs. *Caruthers*, 1 *McCord Rep.* 507.

However extraordinary or erroneous be the determination and proceedings of a court of limited authority, if it acts in its proper jurisdiction as to the subject matter, place, or person, its judgment or decree cannot be impeached or invalidated in a collateral action.—*Jackson ex dem. Jenkins* vs. *Robinson*, 4 *Wend.* 436.

An order or decree of the Orphan's Court of the State of Alabama, in a case within its jurisdiction, like judgments, or decrees in the ordinary course of judicial proceedings, would not be void, or collaterally impeachable, though the proceed- ings may discover errors, for which an appellate court, if directly appealed to, should reverse.—*Wyman et al.* vs. *Campbell et al.* 6 *Porter*, 220.

Again, it was held in *Richardson* vs. *Hobart*, 1 *Stewart's Rep.* 500, that an order of sale made by a county court of Alabama, was its judgment, and that judg- ment could not be impeached incidentally, when introduced as a piece of evidence.

It is not pretended that there was any actual fraud or collusion by the guardian, either in obtaining the order, or in making the purchase under it.

The guardian derived no benefit from the purchase. The testimony shows he acted in good faith throughout the whole transaction. He was actuated by the kindest, purest motives, in all he did. The court below, however, charged the jury, " that though nothing wrong might have been intended, yet, under the cir- cumstances of the case, the purchase was a legal fraud upon the rights of the ward."

By the term legal fraud, or fraud in law, is meant, it is supposed, what is called constructive fraud, " which may be created by such acts or contracts, as, though not originating in any actual evil design, or contrivance to perpetrate a positive fraud, or injury upon other persons, are yet, by their tendency to deceive, or mis- lead others, or to violate public or private confidence, or to impair or injure public interests, prohibited by law."—1 *Story Com. on Eq.* 261. Under this head, may be classed all contracts made in restraint of marriage, bargains made in restraint of trade, contracts between clients and attorneys, trustees, and *cestui que trusts*, and contracts of a similar character.

In many of these cases, such contracts, from considerations of public policy, are held to be void in law.

In the case at bar, these principles cannot apply ; yet the purchase made by the guardian, under the peculiar circumstances of the case, was properly made. It was not in violation of public policy, nor of the real interests of the ward, though her pecuniary interest alone has not been, perhaps, as fully promoted, as if the money had been kept at interest. Yet, when it is considered that the ward de-

rived her property by gift from her father, J. Thompson, one of the defendants, who at the time the purchase was made, was, and is yet, in life; and that the property given to his daughter, the ward, embraced his whole estate; the propriety of the ward's residing with her parents, and of their having a home where they might take their child under their charge to protect, and watch over her, during the years of her minority; the purchase cannot be deemed inexpedient, or so utterly derogatory to the interests of the ward—especially, in a moral and social point of view—as to create a fraud in law. And it is hoped that the time will never come, when our tribunals, authorized to superintend the management of wards and their estates, will have nothing further in view, in the exercise of their powers, than the mere pecuniary interests of those, thus entrusted to their charge.

T. A. LATHAM and WM. EZZARD, for the defendant in error.

Mr. LATHAM argued, that Samuel and Jeremiah Thompson were unnecessary parties : Stell was liable to his ward for the amount of assets in his hands. The point at issue between Stell and his ward was, as to the amount of assets then in the hands of Stell, unaccounted for. The Thompsons were not interested in that question ; one of them was former guardian, but not charged of having any assets in his hands; the other conveyed the land to Stell, as guardian, and having no interest in the question of account made by the bill, they are not legal parties ; for it is interest, immediate or consequential, that makes the necessary parties.—*Milford Pl.* 220 ; 1 *Daniel Chan. Prac.* 200. Jeremiah Thompson was made a party to show that the assets had come regularly down to the hands of Stell; Samuel Thompson, to show that Stell had applied those assets contrary to law, and in violation of his trust. No decree was sought against them, and none could be rendered by the strict rules of equity, for the only question was between Stell and his ward, as to the amount of assets. There was no attempt to reach the assets wrongfully paid for the land in the hands of Samuel Thompson ; no charge that Stell was unable to respond ; and the Thompsons could not be made liable for assets sought to be recovered from Stell, and for which Stell was primarily liable.

In this case, a perfect decree can be made between the surviving parties upon the subject of litigation, and therefore, a reviver is not necessary.—*Leggett* vs. *Dubois*, 2 *Paige*, 211 ; 3 *B. & H. Eq. Dig.* 147 ; *Hoffman Ch. P.* 375. The verdict and decree is according to the case made by the bill. The prayer is immaterial, for it is not absolutely necessary that there should be any special relief inserted.—12 *Ves.* 48 ; 2 *ib.* 395 ; *Story's Eq. Pl.* 41.

But Stell alone appealed under the act.—*Hotchkiss*, 601 ; *Laws of* 1839, *Pamphlet*, 143.

It was under this act, no doubt, that the court below decided that the case need not be revived as to the representatives of Samuel Thompson. Suppose he had been alive, would he have been a party to the issue? Could he have amended his answer ?—continued the case ?—or have done any other act that a party could do ? His day in court was gone. We maintain that a party who has not appealed, has none of the rights of a party in the case; the litigation and the rights consequent upon it are closed as to him. The appeal brings up the case, as between the appellant and the appellee, and as between no other persons. The representatives of Thompson have no more rights than he had, and are bound by what he was. If Thompson could not defend, if living, not being a party to the appeal, his representatives could not after his death. The law gives the representative who is made a party many rights, but they are all limited by the rights that the testator himself had.—*Toller*, 431 ; 12 *Ves.* 315 ; 1 *Johns. Ch. Rep.* 349, 432 ; 2 *ib.* 247 ; 3 *Burrow's R.* 1738 ; 2 *Tidd.* 1198.

2d. What passed at the time, and was understood by the court, was no part of the order. The order is an authority, and cannot be enlarged by parol. The ob-

ject was to prove that an order, general on its face, was subject to restrictions and stipulations not appearing on its face.—1 *Johns. Rep.* 417, 466 ; *Chitty on Contracts,* 25 ; 1 *Johns. Rep.* 231, 339. But this order is in the nature of a record, which is a verity—is to speak for itself, and cannot be gainsayed.—*Fonblanque,* 641.

3d. The accounts of Stell had been made up, returned to the Court of Ordinary, and passed upon and allowed, and letters of dismission granted.ʻ It was his duty to make a return of all his disbursements, and have them allowed by the proper tribunal, and his letters dismissory are an estoppel against his now setting them up.—*Prince Dig.* 232, 240 ; *Hotchkiss,* 337, 477.

4th and 5th grounds. There was no error in the charge of the court as to the construction of the act of 1829. The preamble shows the intention of the Legislature; the 1st and 2d sections, and the first clause of the 3d section, do not touch this case. The last clause provides, that when minors may not be possessed of lands for cultivation, their guardians may apply such portion of their disposable funds, as may be properly applied to that purpose, to the purchase of such reasonable portion of land as may be necessary for the purpose of the act; or they may rent land for the same purposes, under a like order of the court. Now for the facts : the ward was a young lady, 14 years of age ; her property was one negro man whose hire was of the annual value of $75 00, and one negro woman and child, whose annual hire was worth $25 00, and about $800 00 in money. This was all her estate ! And, before the order in question was made, another had been passed to let her father keep, and have the services of, her negroes for her board, while she was going to school. The purchase of the land left the ward without a dollar ! The disposition before made by her negroes, left her without the means of cultivating the land thus purchased ! It was a waste; and the act of 1829, and the order of the Court of Ordinary, cannot justify the guardian. It is not a case within the principles of the act. The ward had no disposable funds. She had no sufficient farming force to justify any reasonable expectation that a farm could be conducted in her behalf, so as to benefit her. Her permanent interest, instead of being promoted, it was obvious, must suffer. The order was procured at the instance of Stell, and its execution was left to his discretion. He was not bound to execute it, and he is responsible. As a trustee, he is bound by all the laws and rules that govern trusts.—*Hotchkiss,* 335 ; *Hovenden on Frauds,* 493 ; 1 *Johns. Ch. Rep.* 477 ; *Green* vs. *Winter,* 39 ; 2 *Johns. Ch. Rep.* 62 ; *Hart* vs. *Ten Eyck,* 109, 114 ; 2 *Story,* 514 ; 16 *Ves.* (*Holland* vs. *Hughes*) 114-16 ; *Bacon,* (*Uses,*) 10.

When special directions are given by the instrument creating the trust, or special duties imposed on the trustee, he must follow out the objects and intentions of the parties faithfully, and be vigilant in the discharge of his duties, to be steadily acted on and executed.—2 *Story,* 517.

·The act of the trustee shall not injure the *cestui que trust.*—*Roy, Ex'r,* vs. *McCollough, Cam. and Nor.* 492 ; 2 *B. and H. Eq. Dig.* 496 ; 2 *John. Ch. Rep.* 442, 491 ; 1 *Hill Ch. Rep.* 409.

Mr. EZZARD, on the same side.

The 1st ground of error assigned, that the court erred in deciding that the representative of Samuel Thompson, deceased, need not be made a party, &c.

It is contended by defendant in error, that, inasmuch as Thompson did not appeal, no verdict could be rendered on the appeal trial which would be prejudicial to his interest, or to the interest of his estate—his rights and the extent of his liability being fixed by the first verdict; and that, therefore, he could have no interest in the trial on the appeal, and consequently there was no necessity for making his representative a party.—*Hotchkiss,* 601 ; *Story Eq. Ple.* 268 ; 3 *Barbour and Har. Eq. Dig.* 147 ; 2 *Paige, Rep.* 211 ; *Hoffman, Chan. Prac.* 375 ; *Mitford Plea.* 94.

2d ground. As to the rejection of parol testimony offered to explain the record, &c., we contend that parol evidence is inadmissible to contradict, vary or add to, a written instrument ; and much less can it be admitted to vary an order of court,

which is a matter of record, and must speak for itself, and more especially where there is no ambiguity. A contract cannot rest partly in writing and partly in parol; and certainly an order of court, which is a matter of record, cannot.—3 *Starkie on Ev.* 100–101; *Chitty on Con.* 87; 1 *Johns. Rep.* 417, 466; 1 *Johns. Ch. Rep.* 231; *Fonblanque's Eq.* 641; *Greenleaf's Ev.* 315.

3d ground. As to rejection of testimony to prove accounts paid by the guardian, which had not been returned to the Court of Ordinary. There was no error in this, because the Court of Ordinary has original jurisdiction of such accounts, which must be passed on by that court in the first instance. The law makes it the duty of guardians to make annual returns of receipts and disbursements to said court, and the presumption is, that they have been submitted and rejected by that court; or, that he retained a sufficient sum in his hands to discharge said debts, on obtaining letters dismissory, and, if rejected by the Court of Ordinary, they could not be allowed by the Superior Court, when brought before it on an appeal; and, if allowed in his settlement with the Court of Ordinary on obtaining letters of dismission, they ought not to be allowed again; and if he had contracted debts for his ward, which he had not paid, it was his own folly to apply for letters of dismission, until he had paid them.—*Constitution of Georgia*, art. 3 sec. 6; *Prince Dig.* 232, 238, 242, 249; *Hotchkiss*, 337.

The 4th and 5th grounds relate to errors alleged to exist in the charge of the court to the jury. Whether the charge was erroneous or not, must depend upon the construction to be given to the statute of 1829.—*Prince Dig.* 253. This statute provides that, when it may be manifestly expedient, guardians may cause plantations to be cultivated for the benefit of their wards; and when minors may not be possessed of lands for cultivation, guardians may apply such of their disposable funds as may properly be applied for that purpose to the purchase of such reasonable portion of land as may be necessary for the purposes of said act; clearly indicating that the guardian, in the exercise of this power, is to use a wise and prudent discretion, and that lands for this purpose can only be purchased when it shall appear to be manifestly for the interest of the ward: and then he is required to make annual returns of his receipts and disbursements under this act. So far from this being the case, the act of the guardian in this particular was, according to the evidence, wholly prejudicial to the interest of the ward: the whole of her funds having been invested in a tract of land which was used and cultivated by another for his own use, and from which the ward received nothing—the guardian never having returned that he had received one cent from the cultivation of said lot of land. In fact he did not pretend to cultivate it; for, as appears from his own answer, he had, previous to that time, procured the court to pass an order, by which he had placed the negroes of the ward in the possession of Jeremiah Thompson, for their board and clothing, and for the board of his ward, and had also secured to Thompson a life estate in one-half of the land, thereby depriving himself of the means of cultivating the same, and rendering it inexpedient and improper that he should have purchased land, provided he had bought it at a fair price.

His Honor Judge WARNER gave no opinion in this case, having been of counsel in the court below.

*By the Court--*LUMPKIN, Judge.

John D. Stell, it seems, was appointed guardian of Maria Louisa Thompson, at the March Term, 1838, of the Court of Ordinary, of Fayette county; and received several slaves, and between eight and nine hundred dollars in money, from Jeremiah Thompson, her former guardian and father. Two years thereafter he obtained an order from the same

31

court, authorizing him to purchase a tract of land from one Samuel Thompson, the grandfather of his ward, and for her use and benefit. At the end of the year 1840, he made the purchase, taking a deed of conveyance to the land; reserving a life estate in one half thereof to Jeremiah Thompson. In March, 1841, Stell was dismissed from his guardianship, upon his own application. His ward having intermarried with Elijah Glass, a bill was filed by them against Stell and the two Thompsons; alleging, among other things, that the order for the purchase of the land was procured by a fraudulent combination between all three of the parties; and that the tract of land was bought and held for the use of the defendants, and not for the benefit of the minor. The bill prayed a general account and settlement. The defendants answered the bill, and at the March Term, 1844, the Superior Court of Fayette county, decreed generally for the complainants the sum of four hundred dollars, the costs to be equally divided between the parties, and that the land remain the property of the complainants.

From this decree John D. Stell alone appealed, and the cause was finally tried before Judge Hill, in March, 1846. Samuel Thompson having, in the mean time, departed this life; Stell, by his counsel, insisted that the legal representative of S. Thompson should be made a party; but the objection was overruled, and the cause ordered to proceed.

Stell offered, among other witnesses, William McBride, the clerk of the Court of Ordinary at the time the order was procured, to prove that he bought the identical land designated in the order, and upon the same terms as were understood and agreed upon between the court and himself. This testimony was repelled by the court. Stell then attempted to prove the amount and payment of sundry accounts, contracted for his ward before, but discharged after, his dismissal. This evidence was rejected.

The case having been submitted to the jury, the court charged: " that the state of things contemplated by the statute (1829) did not exist; and that the defendant neither had the right to apply for, nor the court to grant, the order (for the purchase of the land); and that while nothing wrong might have been intended, it was a legal fraud upon the rights of the ward and should be set aside." Further: " that so far from the purchase being manifestly for the advantage of the ward, as the law declares it must be, it was manifestly subversive of her interest, present and permanent, *and the defendants should be decreed to keep the land, and pay the ward the money on hand,* (i. e. given in payment, $702,) and *interest thereon.*"

The bill of exceptions tendered by defendant's counsel, and signed and certified by the judge who presided at the trial, presents five distinct grounds of error:

1st. In refusing to require the legal representative of Samuel Thompson, deceased, who died intervening the first and second trial, to be made a party.

2d. In rejecting the parol evidence of the clerk of the Court of Ordinary.

3d. In not allowing the guardian to prove the payment of sundry debts contracted on account of his ward *before,* and paid *after,* his discharge.

4th. In charging the jury that the state of circumstances did not exist, which justified John D. Stell, the guardian, to apply for, or the Court of

Ordinary to pass, the order of March, 1840, authorizing the purchase of the land named therein.

5th. In charging the jury, that the purchase made under the order of the Ordinary, was a fraud in law, and manifestly destructive of the interest of the ward, and that the guardian should be decreed to keep the land and pay his ward the money laid out and expended therefor, with interest.

1st. Had the complainant's bill been framed differently, and for the single purpose of calling upon Stell, the former guardian, to account for the trust fund which came into his hands, in that aspect of the case it would not have been necessary to have made either of the Thompsons parties, nor would a demurrer, for want of proper parties, have been sustained.

And had they been joined as defendants, the death of one or both of them need not have arrested the progress of the proceedings. The complainant, however, has seen fit to insert their names, and to couple them with Stell, in a grave and substantial allegation, that the three fraudulently combined together to procure the passage of the order for the purchase of the land, and that it was bought and held for their benefit, and not for the use of the ward. And the bill seeks to have this conveyance canceled. The deed was made by Samuel Thompson, and reserves a life estate, in a moiety of the land, to Jeremiah Thompson. Are not the Thompsons, father and son, deeply concerned in the cause ? They both answered the bill. The first finding charges *them*, together with Stell, with the payment of four hundred dollars, and vests the title to the land in the complainants. Samuel Thompson dies before the final trial ; should not his representative be made a party ?

The whole record goes up, his answer included. The question as to the *bona fides* of the transaction is still strenuously contested ; and the jury upon the appeal decreed twelve hundred dollars for the complainants, and that the sale of the land be set aside. Can it be seriously contended that the estate of the deceased is not concerned in this issue ?

But it is argued, and with much force and ability, that, inasmuch as Samuel Thompson failed or refused to join with Stell in entering the appeal, the case, as *to him*, ended with the *first verdict*. This assumption necessarily involves the construction of the act of 1839, passed to explain and amend the judiciary of 1799, as to granting appeals in certain cases.

The preamble sets forth the mischief which induced its passage ; namely, that a contrariety of opinion existed among the judges of the State, and a different practice prevailed in the various circuits thereof, touching the right to appeal under certain circumstances. The evil alluded to was this : Some of the courts decided, that where there was more than one party, plaintiff or defendant, it was necessary that *all* should unite in entering the appeal, in order to carry the case up. To remedy this inconvenience, it was enacted :

*Section 1st.* " That from and after the passage of this act, it shall and may be lawful, whenever there shall be more than one party, plaintiff or defendant, and one or more of said parties, plaintiff or defendant, desire to appeal, and the other, or others, refuse or fail to appeal, it shall and may be lawful for any party, plaintiff or defendant, to enter his appeal, under such rules and regulations as are now provided by law."

*Section 2d.* " That upon the appeal of either plaintiffs or defendants aforesaid, *the whole record shall be taken up ;* but in case damages shall or may be awarded upon such appeal, such damages shall only be recovered against the party or parties appealing, and their securities, and not against the party or parties failing or refusing to appeal."

*Section 3d.* " That in case any such security or securities shall be compelled to pay off the debt or damages, for which the judgment may be entered in any cause, he, she, or they, shall have recourse only against the party or parties for whom he, she, or they, became security or securities."

*Section 4th.* Repeals all laws and parts of laws militating against the act.

Perhaps a more striking illustration of incautious and improvident legislation is not to be found in the statute-book. Better, far, the old law, with all its faults, than the new, whatever interpretation may be put upon it. It is a Cretan labyrinth, with no thread to assist in ferreting out its inextricable windings. Did it intend to limit the rights of appeal to that class of cases only, which seem alone to be contemplated in the *second* and *third sections,* to wit, where damages might be given for a frivolous appeal, leaving the law as it stood before in all other cases ? Such would be the inference from these two sections—but such is not the restrictive language of the statute. What is meant by the whole record being carried up ?

If the original papers are sent up with the appeal—as they are and must be—what remains for the foundation of the judgment to be signed, and the execution to be issued against the parties who loiter behind ? Or is this to remain in abeyance until after the final decision? If so, upon what principle ?

Take the case now before the court, and how irreconcilable this construction with the facts which it presents. There are three defendants, Stell and the two Thompsons. By the first verdict, the title to the land is vested in the complainants ; by the second, it is reinvested in Samuel Thompson, from whom it was purchased. To whom does it belong? The complainants *below* recovered four hundred dollars, upon the basis of retaining the land ; *above,* twelve hundred dollars, in consideration of relinquishing it. Can complainants collect the four hundred dollars out of the Thompsons, who failed to appeal and retain the land ; or twelve hundred dollars out of Stell, and surrender it ? Are these monied decrees independent of each other ? Or will the satisfaction of the latter extinguish the former, and of the former the *latter,* in whole or in part, *pro tanto ?* We will forbear to press these inquiries further.

On the other hand, does the carrying up of the whole record carry up all the parties to it? And if so, would not the intention of the Legislature, as expressed in the second section, be clearly contravened, in subjecting parties who failed or refused to appeal, to heavier liabilities then were recovered on the first trial, and that, too, when forced to litigate further, without their consent and contrary to their wishes ? and this injury, inflicted frequently by the will of a minority, contrary to the principles of common justice. In the very case before us, parties who refused to appeal from a verdict of four hundred dollars, are, or would be, if properly represented, subjected to the payment of twelve hundred.

And yet, if the Legislature did not mean that the parties failing or refusing to appeal, should, nevertheless, in some sense, be parties to the appeal, why protect them from the damages which might be assessed upon the appeal, and from recourse over, at the instance of the securities on the appeal?

Leaving these and numerous difficulties to be adjusted when they arise, we are of the opinion, that Samuel Thompson was so far a party to this case, on the final trial, as to make it necessary that his legal representative should have been substituted in his stead.

2d. The competency of McBride will depend upon the object for which it is sought to introduce his testimony. Under the act of 1829, guardians are clothed with authority, under an order of the Court of Ordinary, to apply a portion of the disposable funds of their ward, to purchase such reasonable portion of land as may be necessary for cultivation by the slaves of the minor, when it is *manifestly expedient* to do so. Great discretion is allowed the guardian in this matter; but whatever might be his own views of expediency, still the Legislature deemed it proper to submit the question to the Court of Ordinary for its supervision, before the guardian could act. His duty in *the mode* of executing this power is not prescribed as it is in the sale of property. It must, of course, be performed with proper care and circumspection; and failing in this particular, he will be answerable to his ward for the waste or misapplication of the funds so applied, and we are inclined to think that the order itself would not have shielded him from responsibility, had it contained the terms which he proposes to supply by parol. In that event, the court would have exceeded its jurisdiction, and, therefore, the testimony, if legal, would not avail the defendant, nor do we believe it competent to vary or add to that order by oral proof. Still, we hold that the evidence was admissible for the purpose of rebutting the charge in the bill, that the order was fraudulently procured. The order being general, to buy land of Samuel Thompson, it might seem to condemn, on the face of it, the conveyance which was taken, with the reservation in favor of Jeremiah Thompson. The evidence of McBride rebuts that inference, and shows that Stell fully, freely and fairly, communicated to the tribunal, peculiarly charged with the protection of orphans' estates, his whole plan in respect to this transaction, and took their advice in the premises. It certainly disproves the imputation that the court was circumvented in granting the order, and that it was done, whether providently or not, with a complete knowledge of all the facts.

3d. Another question is, as to the rejection of the witnesses offered to prove the payment of certain debts contracted on account of the ward before, but *discharged* after, the dismission of the guardian? None of the pleadings show, whether these accounts were made by the minor herself, or the guardian for her. Nor do we deem it material. In either event, there could be no equity in asking a decree for the trust fund, without first deducting from it the debts and disbursements with which it was properly chargeable. It is true, that the propriety of it would have been more manifest if the guardian had incurred *personal liability* on account of those debts, before obtaining his letters. Suppose a guardian should be removed by the court before he had an opportunity of settling his accounts, and making a return of them to

the Court of Ordinary. Can it be for a moment doubted, that he would, 'in a bill for account, be allowed his credits for legitimate expenditures? It would be his misfortune that he had to resort to original proof, instead of casting the *onus* upon his adversary, by having returned his vouchers to the proper court, and thus made them *prima facie* evidence in his behalf. And a complaint, that he did not avail himself of this advantage, would not well lie in the mouth of his opponent. We are satisfied that the court committed error in refusing this testimony.

4th. Nor are we less upon this ground. The law constituted the Court of Ordinary, and not the judge of the Superior Court, the arbiter as to whether or not, in March, 1840, a state of circumstances existed, which made it proper for the Court of Ordinary to pass the order of that date. The act of 1829 allows the guardian to invest a portion of his ward's funds in land, if it is expedient to do so; and whether it be expedient or not, is an inquiry committed exclusively to the Inferior Court sitting for ordinary purposes, unless contested by appeal. The order on their minutes shows that they acted in the premises, and having jurisdiction over the subject matter, and the persons before them, their judgment cannot be impeached or invalidated in this manner.

The judge of the Superior Court gave his opinion upon the testimony as exhibited on the trial before him, in 1846. But can he undertake to say upon what proof the Court of Ordinary acted, in 1840? Be that as it may, that court, and that court alone, was the proper tribunal to entertain the application, and to pass the order for the purchase of the property.

And the legal presumption is, that that court had sufficient evidence to warrant it in passing the order.—*Dubois* vs. *Dubois*, 6 *Cowen Rep.* 494. It may have acted unadvisedly; probably did, if the pecuniary interest alone of the ward was considered. It is wholly immaterial. The order being passed by a court of competent jurisdiction, and acting within the sphere of its authority, its proceedings cannot be attacked and set aside in this indirect manner.—1 *Pick. Rep.* 435; 6 *ibid.* 223; 10 *ibid.* 470; 4 *Day's Rep.* 432; 3 *Johns. Rep.* 17; 19 *ibid.* 39; 11 *Mass. Rep.* 445; 12 *ibid.* 25, 268; 1 *Peter's Rep.* 74; 7 *Cranch*, 483, 567; 2 *Nott and McCord*, 410 : 6 *Sergt. and Rawle*, 57; 7 *ibid.* 166; 11 *ibid.* 436; 4 *Gill and John.* 1.

The Court of Ordinary, upon the point before them, acted *judicially*, and any error which may have been committed, cannot affect their jurisdiction, and take it away, because improperly exercised.—6 *John. Ch. Rep.* 381; 8 *John. Rep.* 50; 8 *Cowen Rep.* 178; 3 *Cowen*, 206; 3 *Ohio Rep.* 567; 7 *Mass. Rep.* 79; 1 *Peter's Rep.* 340.

5th. Great latitude of discretion is allowed to courts, as to the direction they will give to the testimony. And while all admit the soundness of the maxim, *ad quæstionem juris respondeant judices, ad quæstionem facti respondeant juratores*; that the judges are to answer to the question of law, and the jurors to the matter of fact; still, it is impossible to lay down any fixed rule, beyond which the judges shall not go, in expressing their opinion on the evidence, by way of charge to the jury; it is better, in this country, that they come short, than transcend, the limits assigned them.

The elementary writers, and reported cases, concur in maintaining,

that if the judge dictates to the jury the verdict, they shall render **or** deliver his opinion to the jury on a matter of fact, rather as *direction,* than *mere opinion ;* that the charge should be reviewed for misdirection.

In the *Utica Insurance Company* vs. *Badger,* the court granted a new trial, because the judge erred in not leaving it to the jury, under proper instructions, to say whether the endorsement *was,* or *was not,* the hand-writing of the defendant.

The judge below simply charged the jury that the plaintiffs were entitled to a verdict.

In *Aylwin* vs. *Ulmer,* (12 *Mass. Rep.* 22,) the judgment of the Court of Common Pleas was reversed, and a *venire facias de novo* awarded, because "the charge was calculated to make the jury understand, that the evidence offered was wholly insufficient. *This was undertaking to judge for the jury, and amounted to a declaration to them, that any consideration of the evidence was wholly unnecessary. They must have received the impression, that by law, they could not, on that evidence, find a verdict for the plaintiff"* So, in *Tufts* vs. *Seabury,* (11 *Pick. Rep.* 142,) the verdict was set aside, and a new trial granted, *although justice had been done* in the *case ;* because the judge instructed the jury that certain testimony proved a material fact, when, in truth, it was only evidence from which the jury might or might not have presumed such fact, and a verdict was rendered in conformity to the instruction.

In *Morton* vs. *Fairbanks,* (11 *Pick. Rep.* 370,) in a controversy about shingles, the court below took upon itself to charge the jury, from a personal inspection of the articles, which were brought into court, that they *were not shingles.* Upon this and another exception, a new trial was granted, on the ground "that the point thus decided, was a question of fact, *and the jury may have been unduly influenced, for they may have considered themselves* not at liberty to find contrary to the decision of the court.

In *Fisher's Executor* vs. *Duncan and Turnbull,* (1 *Hen. and Mun.* 563,) the Supreme Court of Virginia decided, that the County Court, on the trial below, erred, "in having instructed the jury, that from the whole testimony before them, the demand of the plaintiff was not barred by the act of limitations ;" and Judge Fleming declared, that he conceived this to have been an improper interference and an infringement on the privileges of the jury, whose right it is to judge of the sufficiency of the evidence adduced to establish any fact, or facts, in the issue before them ; *the province of the court being to see that all proper evidence offered (and none other) be submitted to the consideration of the jury, without saying what effect such evidence ought to have in the cause.*

So far is this doctrine extended in this State, (Va.) that the judges do not proceed *to sum up the evidence,* as is usual in England, and some of the other States ; "a course," says Judge Tucker, "*which would, probably, be deemed with us an invasion of the privileges of jury trial."—Commentaries,* vol. 2, 299.

In the *New York Fire Insurance Company* vs. *Walden,* (12 *John. Reports,* 512,) the court say: "And here, I apprehend, lies the error committed by the learned judge: that he has given a binding direction to the jury, upon matter of fact, as if it had been matter of law. If the charge had been intended as a mere opinion to the jury, on a matter of

fact, on which they were to exercise their judgment, the jury would, undoubtedly, have been told, that the defence in the case rested upon the question of the materiality of the letters and facts not disclosed, and *that it was for them to judge, from the evidence, whether the disclosure would have varied the premium; and that, if the jury should be of the opinion that the facts not disclosed were, in that sense, material, they must find for the defendant; and that, if they thought otherwise, they ought to find for the plaintiffs.* This would have been the language of a charge, suited to the submission of such a point.

"In order to preserve a just balance between the distinct powers of the court and the jury, and that the parties may enjoy unimpaired vigor—their constitutional right of having the law decided by the court, and of having the facts decided by the jury—every charge should distinguish clearly between the law and the fact, so that the jury cannot misunderstand their rights, or their duty, nor mistake the opinion of the judge, upon matter of fact, for his direction in point of law. . *The distinction is all-important to the jury.* The direction of the judge in the one case is obligatory upon their consciences, and so they will, and so they ought, to regard it; but his opinion in the other case is mere advice, and the jury are bound to decide for themselves, notwithstanding the opinion of the judge, and to follow that opinion no further than it corresponds with the conclusions of their own judgments. *Unless this distinction be kept steadily in view, and be defined with all possible precision, the trial by jury may, in time, be broken down, and rendered nominal and useless.*

"All that I feel it my duty to contend for is, that whenever the judge delivers his opinion to the jury, on a matter of fact, it shall be delivered as mere opinion, and not as direction; and that the jury shall be left to understand, clearly, that *they* are to decide the fact, upon their own view of the evidence, and that the judge interposes his opinion only to aid them in cases of difficulty, or to inspire them with confidence in cases of doubt.

"I am disposed to hand to posterity the institution of juries, as perfect, in all respects, as we now enjoy it; for I believe it may, in time hereafter, be found to be no inconsiderable security against the systematic influence and tyranny of party spirit in inferior tribunals."

I have felt it my duty to transcribe into this opinion these eloquent remarks of the learned chancellor, alike creditable to his head and heart. Were their spirit more thoroughly infused into our system, we should no longer hear it cast upon it as a reproach, that the use of a jury is merely to screen the court from the responsibility and odium of a decision, which is, in fact, in most cases, the result of the judge's own view of the testimony. It is needless to preserve the *form* of trial by jury, if that body is deprived of its just powers and privileges. Under the infamous Stuarts, and their still more infamous tool, Lord Jeffries, it was, literally, "a nose of wax," to be moulded as the judge saw fit; and it should never be forgotten that Sydney and Russel were doomed to death *by a jury of the country!*

From an examination of the evidence, we are inclined to agree with the court whose judgment we have under review, that the trust confided to Stell, the guardian, was injudiciously exercised, and that no fault can be found with the verdict of the jury; still we cannot seal with our

sanction a charge, which declares, authoritatively, that the defendant should be decreed to keep the land, and pay the ward the money on hand, (the purchase-money,) with interest. This is not the expression merely of an opinion, but is the very language of *direction* from the bench. In the case in 12 *Johnson* there is a precedent of a bill of exceptions, taken from 3 *Burr*. 1742, to a charge by Lord Camden; and it is in these words : " And the said chief justice did then and there declare and deliver his opinion to the jury, that the said several matters, so produced and proved on the part of the defendants, were not, upon the whole case, sufficient to bar the action, and with that opinion left the same to the jury." " In this case from *Burrow*," say the Court of Errors of it, ( *Yer*. 15,) " it was never doubted but that the opinion of the chief justice, so stated in that bill, was taken and received as a direction in point of law; and if the charge in the case before us is not deemed of that character, it will be impossible hereafter to discriminate between a charge containing a positive direction in point of law, and mere advice on a matter of fact."

We are satisfied that no one values more highly the independence of " this body of twelve " than the learned and upright judge who made this charge ; and that he would be one of the last to trench intentionally upon the rights and privileges of those who are selected to decide upon the estates, freedom and life of their fellow-citizens. We are constrained, from regard to principle, however, to sustain the exception.

Let the judgment be reversed.